UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARY-JO HYLDAHL,

        Plaintiff,

                                        Case Number 07-14948-BC

v.                                       Honorable Thomas L. Ludington

AT&T,

        Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR DIRECTED VERDICT AND FOR A NEW TRIAL AND SETTING BRIEFING SCHEDULE AND HEARING FOR PLAINTIFF'S MOTION FOR ATTORNEY FEES

On December 14, 2006, Plaintiff Mary-Jo Hyldahl ("Plaintiff") decided that she was unable to perform her employment duties because she was suffering from depression and post traumatic stress disorder ("PTSD"), serious medical conditions under the Family Medical Leave Act ("FMLA"), codified at 29 U.S.C. §§ 2601, *et seq.*   Suspecting fraud, Plaintiff's employer, Defendant AT&T ("Defendant"), placed her under surveillance.  After reviewing the activities Plaintiff was able to engage in on that day, Defendant concluded that Plaintiff was also able to perform her employment-related responsibilities.  In response, Defendant terminated Plaintiff's employment for, in its view, fraudulently requesting leave under the FMLA.

On September 25, 2007, Plaintiff filed a complaint in Saginaw County Circuit Court, which alleged that Defendant interfered with her rights under the FMLA and retaliated against her for asserting rights under the FMLA, in violation of 29 U.S.C. § 2615.  Dkt. # 1.  After removal to this Court, Defendant's motion for summary judgment was granted in part and denied in part, dismissing Plaintiff's claim for retaliation because the record indicated that Defendant maintained an honest belief that Plaintiff abused the leave provision of the FMLA.  Dkt. # 24 at 8-10; *see Joostberns v.*

*United Parcel Serv., Inc.*, 166 F.App'x 783, 794-95 (6th Cir. 2006). In contrast, the Court denied summary judgment with respect to the interference claim, reasoning Plaintiff's medical providers' certification that her medically-diagnosed conditions precluded her from completing the tasks of her employment raised a factual dispute that she suffered from a serious medical condition on December 14, 2006. Dkt. # 24 at 12.

On January 14, 2009, an eight-member jury unanimously concluded that Defendant interfered with Plaintiff's rights under the FMLA. *See* dkt. # 50. The jury awarded Plaintiff $127,895.56 for damages incurred between her discharge and the verdict and $150,531.46 to compensate for prospective injury. On January 30, 2009, Defendant moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 or, in the alternative, a new trial pursuant to Fed. R. Civ. P. 59. Defendant believes that it is entitled to a judgment as a matter of law because a reasonable jury could not conclude that Plaintiff suffered from a serious medical condition. Defendant also contends that a new trial is necessary because Plaintiff's counsel utilized a prejudicial closing argument and the Court did not provide a corrective instruction. After considering the arguments advanced in the pleadings and at oral argument on April 15, 2009, the Court will **DENY** the motion.

I

On February 26, 1996, Defendant hired Plaintiff as a service representative at a Michigan Bell Call Center. Plaintiff's employment responsibilities included receiving telephone calls from residential customers concerning their phone service, addressing billing issues, and selling additional products. Plaintiff also placed sales calls to customers and undertook various clerical duties. Plaintiff primarily worked in a cubicle, utilizing a telephone headset and a computer.

In 1999, Plaintiff sought treatment for depression and anxiety at Delta Psychological and Neurobehavioral Services ("Delta"). Through Delta, Plaintiff received treatment from Anne Olsen

("Olsen"), a licensed master social worker, and Dr. Kaushik Raval ("Dr. Raval"), a board-certified physician in psychiatry, neurology, and psychosomatic medicine. As a consequence of their professional association, Olsen referred patients requiring prescription medication to Dr. Raval, and Dr. Raval would offer recommendations for therapy. Between 1999 and 2007, Olsen and Dr. Raval periodically treated Plaintiff. Dr. Raval estimated that he met Plaintiff approximately a dozen times during the period of time he was managing Plaintiff's depression and anxiety medications.

Plaintiff experienced high levels of stress, including feelings of anxiety, sadness, low self esteem, and worthlessness. On September 23, 1999, Plaintiff first sought treatment from Olsen, who diagnosed her with depressive disorder. On November 1, 1999 Dr. Raval began treating Plaintiff, diagnosing her with major depression and "recurrent episodes of adult psychotic features." Dkt. # 57 at 85. At that time, Dr. Raval believed that Plaintiff was experiencing a major depressive episode and recommended that she not work for at least a month. Psychotherapy and prescription medication helped Plaintiff manage her issues and she returned to work.

In 2002, Dr. Raval and Olsen again treated Plaintiff after she experienced an episode of depression. During the course of therapy, Plaintiff revealed that she was subjected to sexual abuse by her brother as a teenager. Dr. Raval further diagnosed Plaintiff with PTSD.

In addition to providing treatment, in late 2002 or early 2003, Olsen and Dr. Raval authorized Plaintiff to take medical leave under the FMLA. Olsen completed the FMLA form, with Dr. Raval reviewing Olsen's recommendation. Dr. Raval agreed that Plaintiff suffered from a serious health condition, chronic in nature, recommending two to forty-eight hours of intermittent leave a month when Plaintiff experienced the symptoms. Dr. Raval believed intermittent leave would address severe episodes and allow Plaintiff to continue working without missing extended periods. Dr. Raval did not place Plaintiff under physical restrictions and acknowledged that it would

-3-

be beneficial for Plaintiff "to be around people who are sympathetic to her problems" when her symptoms flared.   Dr. Raval agreed that solitude may be counterproductive when Plaintiff experienced an episode.

On the other hand, Olsen did note when Plaintiff experienced symptoms that she "should be at home resting when not at work," but acknowledged that in some circumstances Plaintiff "needed to get away from home." Dkt. # 58 at 32.  The FMLA authorization form, however, did not identify restrictions of movement, nor did Defendant independently inquire as to limitations.  In addition, a physical manifestation of Plaintiff's PTSD was the possibility of experiencing a "blackout." Dkt. # 58 at 68-69.  Consequently, Olsen recommended that Plaintiff not drive when she experienced a dissocative episode.  Neither Dr. Raval or Olsen restricted Plaintiff to her home or prohibited her from driving when experiencing her episode.

In 2003, Defendant approved forty-five of fifty FMLA requests by Plaintiff, totaling 232 work hours.   In 2004, Plaintiff exhausted all twelve weeks of available leave under the FMLA.  In 2005, Defendant approved all of Plaintiff's requests for leave under the FMLA.  In 2006, Defendant approved seventy-nine requests for leave, totaling over 400 hours.  Pursuant to a provision in the collective bargaining agreement, Plaintiff's periods of leave were fully compensated.  The FMLA, however, does not require that an employer compensate an employee when he or she utilizes FMLA leave.  *See* 29 U.S.C. § 2612.

In July of 2006, Defendant's "attendance manager," Michael Bouvrette ("Bouvrette"), suspected that Plaintiff may have been misusing her FMLA leave to extend her weekends.  On October 16, 2006, Bouvrette requested that Plaintiff's FMLA requests be investigated.  On November 15, 2006, Mary Glass ("Glass"), Defendant's "FMLA escalation support manager," requested a formal investigation after reviewing Plaintiff's pattern of requests.  Defendant initiated

an investigation and Defendant conducted surveillance of Plaintiff on four days when she requested leave, including December 14 of 2006. The first two days of surveillance did not yield any activities, in Defendant's view, inconsistent with Plaintiff's PTSD or depression.

On December 12, 2006, Plaintiff interviewed for a promotion. Defendant contends that Plaintiff indicated during an interview that her regular absences would soon diminish. Plaintiff strongly denied that she made such a representation. On December 14, 2006, surveillance observed conduct that Defendant characterizes as inconsistent with symptoms associated with PTSD and depression.

The parties agree on Plaintiff's activities on that day. Plaintiff and Defendant's investigator collaborated on the following statement describing her activities on December 14, 2006 as follows:

> At 10:28 am [sic] I leave my residence and drive approximately one hour to Shattuck Dental Center which is 41 mile [sic] from my home. At 11:31 am [sic] I enter the Dental Clinic and remain there for around two hours. I had a broken tooth, up under the gum that was causing me some pain. My treating physician for my FMLA was aware that I had this tooth condition (pain). Pain caused my "condition" to worsen, that is why I brought it to the attention of my FMLA doctor. I will provide [Defendant] with an authorization to speak to any of my treating physician [sic] to verify this information if requested to do so.
>
> This dentist appointment was billed through [Defendant's] dental plan benefits. I am not sure when I made this appointment with my dentist.
>
> At 2:36 [sic] I depart from the Dental Center, re-enter my vehicle and drive to Ya-Ya's Flame Broiled Chicken restaurant 2 miles away and enter the building. The dentist had recommended eating something, I needed to get nutrition. At 3:30pm [sic] I exit the restaurant, re-enter my vehicle and drive to Quizno's Subs Restaurant/Starbucks approximately 21 miles away on Main Street in Birch Run MI [sic]. I proceeded the drive through lane and purchased a peppermint mocha coffee. I the [sic] leave the restaurant and drive approximately 21 mile [sic] to the Davison Barber shop [sic] located on Davison Rd. The Barber Shop is also attached to the Affinity Day Spa. The barber shop [sic] and day spa are two separate businesses. I had called my friend [Linda Dahl] who works at the Barber shop [sic] earlier this day and asked her if there was anything she could do to fit me in. I advised Mr. Meisnitzer that he could call Linda if he wished to verify this. I had my hair cut and colored while I was in the Barber Shop. My treating physician has told me to do whatever I need to do to keep my condition in line and hold off on my

dissociative periods. He has not put any restrictions. Holidays are the most
challenging time for me and The [sic] barber shop [sic] was also having their
Christmas party at the same time I was getting my hair done.

I remained at the Davison Barber shop until around 8:23 pm. [sic] I left the
Barbershop [sic] followed by another woman, Dawn Caverly who I ran into in the
barber shop. Dawn is a friend of mine who I hadn't seen in years. We left the barber
shop and drove about 10 miles to Senior Lucky's Cantina. We entered the Cantina
and had something to eat and drink at the bar. I am not sure what time I left the bar,
but I think I drove directly home which is approximately 53 mile. [sic]

Dkt. # 15-7 at 7-8. Plaintiff's statement was developed during an interview on January 4, 2007.

Moreover, Defendant acknowledges that Plaintiff accurately and honestly explained the activities

on December 14, 2006. Defendant has not alleged that Plaintiff, when confronted, attempted to

mislead Defendant's investigator about her activities.

With respect to December 14, 2006, Plaintiff described her mental state as follows:

I just wasn't feeling right. I was anxious, I was overwhelmed, I was in pain, I had
broken my tooth, I had the – the holidays were a rough time anyway so I was dealing
with that. You know, I was still kind of reeling from [being denied a promotion] at
work, too."

Dkt. # 56 at 46. Further, Plaintiff testified that "[t]here was no way that [she] could perform [her]

job duties that day, [she] was not feeling good." Dkt. # 56 at 56.

On January 8, 2007, Glass concluded that Plaintiff had not utilized leave to accommodate

her serious medical condition and Defendant denied Plaintiff's request for leave. An internal e-mail

suggests, however, that after a member of Defendant's investigation unit reviewed the surveillance

report and noted an inaccurate assertion, Glass had already decided to deny Plaintiff's FMLA

request for December 14, 2006 prior to the scheduled interview with Plaintiff.

On January 6, 2007, Olsen and Dr. Raval co-authored a letter concerning Plaintiff's conduct

of December 14, 2006. The letter provided as follows:

[Plaintiff] has been diagnosed with severe [PTSD] and Major Depression. These
conditions impact every area of functioning . . . Her most difficult times are when

-6-

she is under increased stress, which is usually work-related or when involved with family of origin issues.  She is also triggered by times of increased physical pain.  The most difficult symptom we have to deal with in the entire cluster of symptoms that she lives with is a tendency to experience dissociative episodes.  These are blocks of time where she loses awareness and can occur for a few minutes or an hour or longer.  So you can see where stress management strategies are crucial to her successful management of her condition.

*      *      *

The recommended activities that [Plaintiff] has been encouraged to engage when her symptoms rise are based on which symptoms she is experiencing.  If the dissociative episodes are occurring or are threatening, she must be very careful.  If she is at home [sic] she needs to stay there.  If she is away from home [sic] she needs to find places and people who are supportive and caring for her so she can establish safety.  Since she lives alone her social system becomes an important facet of her decisions.  Even without the dissociative episodes, she is not always encouraged to stay quiet at home.  Being alone can exacerbate the difficulty sometimes.  Being around people who are caring and perceptive is one of her primary tools to get on top of an episode of her anxiety or depression.

On the day in question leading to her present crisis, [Plaintiff] was observed in a series of activities that seem to have drawn the conclusion that she was engaging in behavior that was contrary to her FMLA approval.  When I saw the series of stops and activities that were recorded for that day, I became alarmed.  First of all, she has gaps in memory.  This is one of the more severe symptoms she has.  Then, I interpret her behavior as random and wandering.  That isn't helping her at all until I note that she stopped to see a woman she has known for a long time who was a very caring relationship with [Plaintiff] and took her into her shop and cared for hair.  This caring interaction as well as the distraction it provided was very helpful.  As was the contact with the dentist to address her pain. [Plaintiff] has to use the people she knows who can provide the support and care she needs at the moment these issues arise.

We believe that [Plaintiff's] choices on the day in question were strained but were along the lines we have recommended as she develops stress management strategies to give her control over a severe and chronic condition.

Dkt. # 17-14 at 1-2.  Dr. Raval explained that he described Plaintiff's choices as "strained" because her activities that day "went on for some period of time."  Dkt. # 57 at 110.

Notwithstanding Plaintiff's activities, Dr. Raval certified that Plaintiff was unable to work and that leave from work was appropriate from December 13 to 15, 2006 on a form approved by

Defendant for certifying FMLA leave.  Dr. Raval reached that conclusion without speaking with Plaintiff on that date and relied on Olsen's diagnosis that Plaintiff suffered from symptoms on those days.  At trial, Dr. Raval acknowledged that he was unable to offer an opinion about whether Plaintiff was incapable of performing her job on December 14, 2006 based upon a discussion with, or an examination of, Plaintiff.

Olsen also offered her opinion that Plaintiff's activities were consistent with her inability to work because her explanation of the way she felt demonstrated her need to find a "supportive environment."  Dkt. # 58 at 48. Similar to Dr. Raval, Olsen did not speak with or treat Plaintiff on December 14, 2006.  Rather, Olsen concluded that Plaintiff was unable to work based on her past experience working with Plaintiff and her "trust" in Plaintiff's representation that December 14 was a "very difficult day."  *Id.* at 83-84, 97-98.

As part of the Defendant's investigation, Glass elicited the opinion of a board-certified psychiatrist, Dr. Judith Lichtenstein ("Dr. Lichtenstein"), to explain Plaintiff's medical or psychiatric circumstance and the appropriate treatment.  After speaking with Olsen on October 8, 2006, Dr. Lichtenstein prepared a written report that concluded Plaintiff's condition required Plaintiff to rest at home and to not operate a vehicle due to the potential for "blackouts."  The report also offered the opinion that Plaintiff should not conduct "home maintenance" or undertake recreational activities.  Notwithstanding Defendant's efforts to investigate Plaintiff's use of FMLA leave, Defendant did not request Plaintiff to submit to a physical examination as permitted by the FMLA.  *See* 29 U.S.C. § 2613(c).

On January 12, 2007, Defendant suspended Plaintiff for alleged abuse of FMLA leave. Although Plaintiff was suspended for violating a fraud provision in the collective bargaining agreement, the union did not appeal the suspension.  On January 19, 2007, Defendant terminated

Plaintiff's employment on the basis that Plaintiff abused FMLA leave to attend a dentist appointment and engage in activities inconsistent with her claim that she was unable to perform the duties of her employment.

## II

### A

The standard of review for a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) is governed by the same standard for motions for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). This Court must "direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict" or if there is insufficient evidence to create a genuine issue of fact for resolution by a jury. *Id.* Stated otherwise, if after viewing the evidence in the light most favorable to the non-moving party, "a reasonable trier of fact could draw only one conclusion," judgment should be granted for the moving party. *American & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 157 (6th Cir. 1997); *see also Jordan v. City of Cleveland*, 464 F.3d 584, 594 (6th Cir. 2006).

### B

The jury concluded that Plaintiff demonstrated "by a preponderance of the evidence that she had a serious health condition certified by a healthcare provider that made her unable to perform the functions of her job on December 14, 2006." Dkt. # 50 at 1. Defendant asserts that Plaintiff did not present sufficient evidence for the jury to conclude that she was incapacitated from a serious medical condition, as defined by the FMLA, 29 U.S.C. § 2611(11), on December 14, 2006.[1] Before addressing Defendant's substantive argument, one point must be made. Much of the authority

---

[1] Defendant conceded that the other elements of a prima facie claim for interference with FMLA rights were met. *See Cavin v. Honda of Amer. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (plaintiff must demonstrate he or she was an eligible employee entitled to and provided notice of FMLA leave, and that defendant was a covered employer that denied or interfered with FMLA benefits).

advanced by Defendant discusses a plaintiff's evidentiary burden to establish a serious medical condition. Dkt. # 61 at 7. For example, the Seventh Circuit concluded that the plaintiff's testimony that he visited a doctor and underwent physical therapy did not meet his burden of demonstrating "a chronic or long-term health condition of the severity contemplated by the FMLA." *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 500-01 (7th Cir. 1999). The court noted the absence of an affidavit from a physician or other medical professional "demonstrating the necessity of the treatments." *Id.*; *see also McClure v. Comair, Inc.*, 2005 WL 1705739, *6 (E.D. Ky. July 20, 2005) (a plaintiff's own representations regarding serious medical condition are insufficient to establish FMLA rights if unsubstantiated by a medical professional); *see also Dowell v. Indiana Health Physicians, Inc.,* 2004 WL 3059788, *6 (S.D. Ind. Dec. 22, 2004) ("without diagnosis or treatment by a health care professional . . . [the plaintiff's] own assertion of a relationship between her depression and pregnancy does not automatically create a serious health condition"). Those cases, however, are only partly applicable to the circumstances presented by this case.

Under the FMLA, "a mental condition that involves . . . continuing treatment by a health care provider" is recognized as a serious health condition. 29 U.S.C. § 2611(11). Plaintiff introduced testimony of two licensed healthcare providers that diagnosed her with two mental conditions, PTSD and depression, and documented years of treatment. Indeed, Defendant did not dispute that Plaintiff was afflicted with a serious medical condition, as contemplated by the FMLA or that intermittent leave was warranted. Rather, Defendant challenges the assertion that PTSD and depression, acknowledged serious medical conditions, actually incapacitated Plaintiff on December 14, 2006. Incapacity is defined as an "inability to work . . . or perform other regular daily activities due to a serious health condition." 29 C.F.R. § 825.113(b).

With that in mind, Defendant advances three interrelated arguments attacking the conclusion

that Plaintiff was incapacitated.  First, Defendant contends that Dr. Raval and Olsen did not verify Plaintiff's incapacity and, thus, could not offer an opinion about Plaintiff's condition on that specific day.  Second, Defendant contends that Plaintiff's assertions regarding her own condition on December 14, 2006 do not satisfy her evidentiary burden.  Dkt. # 61 at 6.  Third, Defendant argues that Plaintiff's conduct on December 14, 2006 was simply inconsistent with the assertion that she was incapacitated and unable to work on that day.

Defendant contests the merit of the FMLA certification with respect to December 14, 2006.  It is undisputed that Plaintiff was generally certified to utilize FMLA leave prior to December 14.  In addition, at Defendant's request, Dr. Raval and Olsen tendered supplemental certification, which relied on the course of care and Plaintiff's later representations about her condition on that day.  Dr. Raval and Olsen testified that Plaintiff suffered from chronic, episodic mental health issues.  Throughout the course of Plaintiff's treatment, neither suspected Plaintiff of misrepresenting her symptoms or malingering.  In addition, each believed that evidence of on-going therapy sessions and use of prescription medication supported the conclusion that Plaintiff continued to suffer from her diagnosed condition.

Defendant emphasizes that neither treater verified Plaintiff's condition on December 14, 2006 or even spoke with her on that date.  Put another way, Defendant challenges the professional methodology employed by Dr. Raval and Olsen when certifying Plaintiff.  There is no indication that Defendant disbelieved or challenged Dr. Raval and Olsen's diagnosis until surveillance captured Defendant's conduct on December 14, 2006.  While in Defendant's view the treaters should have verified Plaintiff's capacity with respect to each individual request, Defendant has not advanced legal authority requiring such verification.  Nor did Defendant offer a professional opinion challenging Dr. Raval's or Olsen's methodology.  In contrast, the record indicates that Defendant

accepted the certification process that prospectively approved Plaintiff's intermittent leave. On no other occasion was Plaintiff required to have concurrent verification of her incapacity. At trial, Defendant did challenge Dr. Raval and Olsen's certification during their cross examination of each witness. The jury rejected Defendant's interpretation of the record.

One subject not directly addressed by the parties' papers should be introduced here as it is relevant to Defendant's argument that a contemporaneous verification of a patient is necessary to a valid FMLA certification, on the one hand, and its argument, addressed later in the opinion, that the Court erroneously informed the jury that Defendant could challenge the certification under the FMLA by requesting an additional medical opinion. During the early portions of Defendant's cross examination of Olsen, Olsen confirmed without objection by Plaintiff that she treated no less than forty of Defendant's employees working at the Call Center, that Plaintiff was one of the sources of referral, that Olsen's revenue was in part dependent on treating patients from the Call Center, and that it was a common practice for her to complete FMLA forms for two to forty-eight hours of FMLA leave. Following objection by Plaintiff's counsel, a hearing was conducted outside the presence of the jury concerning the relevance of Olsen's treatment of other Call Center employees. Counsel for Defendant contended that the questioning was relevant to one of the important issues in the case – the medical certification forms that Olsen had completed. The Court permitted further cross examination of Olsen and Dr. Raval about their professional methods of treatment and its consistency, but barred further inquiry of the two treaters about other Call Center patients insofar as Defendant did not anticipate offering testimony challenging their methods of practice as violative of professional standards of care or that it otherwise constituted fraud on Defendant.

Next, Defendant disputes that Plaintiff offered "specific evidence showing that she was unable to work due to that condition" on December 14, 2006, dkt. # 61 at 9 (citing *Austin v. Haaker*,

76 F. Supp. 2d 1213, 1221 (D. Kan. 1999)), and believes that the record supports a single conclusion – that Plaintiff's activities demonstrated a capability to perform her duties on that date.  With respect to Plaintiff's symptomology on December 14, 2006, Plaintiff testified that she experienced anxiety, a feeling of being "overwhelmed," physical pain, and she was still "reeling" from a work-related incident.  Defendant argues that Plaintiff did not explain how these emotions impaired her capacity to perform her duties.  Plaintiff's testimony in conjunction with Dr. Raval's and Olsen's testimony concerning Plaintiff's functional abilities provides a plausible basis for the finder of fact to conclude that her anxiety and associated emotions impaired her ability to perform her employment.

Finally, Defendant argues that Plaintiff's conduct was inconsistent her contention she could not work on December 14, 2006.  While a finder of fact could reasonably adopt Defendant's view, the record also supported the jury's conclusion.  For instance, Olsen acknowledged that an appropriate response to her symptoms may be to remain at home, but Olsen also testified that, at times, it was appropriate that Plaintiff seek out a "supportive environment."  Dr. Raval echoed this view.  Olsen also believed that Plaintiff's employment environment included stressors that could exacerbate her symptoms.  Accordingly, when her symptoms manifested, the medical providers authorized Plaintiff to be absent from work and to take the course of action that Plaintiff determined to be appropriate – either remaining home or seeking support.

Plaintiff testified about the advice she had received from Dr. Raval and Olsen.  She emphasized that she relied on their guidance in determining the symptoms that qualified her to be eligible for FMLA leave.  Moreover, the record demonstrates, when confronted by Defendant's investigators, that Plaintiff did not misrepresent or conceal her actions of December 14, 2006. While the Court, if it were the finder of fact, would have difficulty squaring Plaintiff's activities and apparent cognitive and emotional capability with an inability to perform her employment

responsibilities on December 14, 2006, Dr. Raval and Olsen's testimony supports the jury's conclusion that Plaintiff self reported consistently with an incapacity. The Court will deny the Rule 50(a) motion.

III

Defendant next argues that two errors in the jury instructions compel the Court to vacate the jury's verdict and order a new trial. A district court may order a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A new trial is appropriate when the jury reached "a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir. 1989); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)).

In the instant case, Defendant first argues that the Court incorrectly instructed the jury that Defendant could not challenge the quality of the FMLA certification without seeking a second medical opinion before discharging Plaintiff. Defendant also asserts that the Court erroneously excluded an instruction requested by Defendant that the jury not consider whether termination of employment was "fair or appropriate" in that circumstance.

A

A court should "reverse a judgment based on inadequate jury instructions only 'if the instructions, viewed as a whole, were confusing, misleading and prejudicial.' " *Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 445 (6th Cir. 2005) (citing *Kitchen v. Chippewa Valley Sch.*, 825

-14-

F.2d 1004, 1011 (6th Cir. 1987)).

In order to explain the FMLA process to the jury, the Court briefly discussed the FMLA, which included the following instruction regarding certification:

> An employer may require an employee to provide a healthcare provider's certification confirming the existence of a serious health condition . . . While a medical certification provided by an employee is presumptively valid if it contains the required information and is signed by the health care provider, the employer may dispute the validity of the information included in the certificate. An employer may also challenge the healthcare provider's medical opinion by requesting a second opinion from another healthcare provider.

Dkt. # 51 at 6. Plaintiff sought the instruction based on her view that Defendant was actually challenging the healthcare providers' certification. Defendant argues that the Court erred by informing the jury that the FMLA permitted, but did not require, Defendant to challenge Dr. Raval and Olsen's certification.

Indeed, an employer may challenge a certification by requesting that a plaintiff submit to a second medical opinion. 29 U.S.C. § 2613(c). This provision, however, "does not impose an affirmative duty" to do so. *Novak v. Metrohealth Med. Ctr.*, 503 F.3d 578, 579 (6th Cir. 2007). In the event an employer does not request a second opinion, the employer is "not preclude[d] . . . from contesting the employee's certification." *Id.* at 580.

While *Novak* acknowledges that an employer is not bound to obtain a second opinion, the circumstances in *Novak* are distinguishable from the facts of the instant case. In *Novak*, the relevant issue presented was whether the plaintiff's "certification forms were insufficient to establish the existence of a serious health condition for purposes of FMLA." *Id.* at 578. On appeal, the plaintiff argued, inter alia, that the defendant was precluded from challenging the validity of the certification because it did not seek a second opinion. *Id.* at 579. After evaluating the provision permitting second opinions, the Sixth Circuit concluded that an employer did not have a duty to seek a second

-15-

opinion as a condition to challenging the adequacy of the certification.  *Id.* at 580.

In the instant case, Defendant did not challenge the adequacy of the certification forms or the fact that Plaintiff suffered from a serious medical condition.  Rather, Defendant challenged Plaintiff's explanation of her symptoms on a single day, contending that her conduct was inconsistent with her self-reported symptoms of PTSD and depression.  As discussed above, Plaintiff understood, based on the advice of her healthcare providers, that she could, and indeed should, avoid her work environment to minimize stress and it was acceptable for Plaintiff to seek a "supportive environment."  Defendant took issue with that view.

In response, Plaintiff argued that Defendant's issue was with the diagnosis and recommended course of care, not Plaintiff's good-faith understanding of her symptoms.  In her closing argument, Plaintiff's counsel stated that "you have now been instructed that they should have sought – or they had the option to seek a second opinion."  Dkt. # 59 at 28.  Defense counsel objected to this statement, citing *Novak*.  The Court denied the objection because Defendant had directly attacked the treaters' professional methodology during the course of the case and because the instructions also made it clear that seeking a second professional opinion was merely an option available to Defendant.  Plaintiff argued that Defendant elected not to pursue a second opinion.  In light of the fact that Defendant directly attacked the healthcare providers' belief that they could formulate a professional opinion in the manner that they did, it was not misleading for Plaintiff to discuss the availability of a second opinion.  Thus, the Court will deny Defendant's motion.

B

Defendant also contends that the Court erred when it did not instruct the jury that it should not consider whether termination of employment was a "fair or appropriate" measure.[2]  In

_____

[2]  The parties agreed that Plaintiff's discharge constituted an act of interference and that the disputed issue was whether a serious health condition prevented Plaintiff from performing her work on that day.

anticipation of trial, the Court requested proposed jury instructions from the parties that were received on December 17, 2008.  The parties proposed instructions, jointly and individually.  The initial proposed instructions excluded any instruction regarding Defendant's discipline or termination of employment in this case. After considering the proposed instructions and relevant legal authority, the Court provided a first draft of instructions to the parties on December 24, 2008 – several weeks before the trial began.  The verdict form attached to the Court's first draft requested the jury to determine if Defendant interfered with Plaintiff's rights when it terminated her employment.

On January 6, 2009, Defendant submitted supplemental instructions, which requested that the Court incorporate the following additional instruction:

> There is no dispute in this lawsuit that Defendant honestly believed that Plaintiff's request for FMLA leave on December 14, 2006 was fraudulent, and terminated her employment for that reason. In determining whether Defendant interfered with Plaintiff's FMLA rights, you need not decide whether termination of her employment was fair or appropriate.

Dkt. # 44 at 1.  In addition, rather than asking the jury to determine if Defendant was "[l]iable for interfering with the plaintiff's rights under the FMLA when the defendant suspended her employment on January 12, 2007 and terminated her employment on January 19, 2007 for utilizing FMLA leave on December 14, 2006 while she was on leave for a serious medical condition," Defendant requested that the verdict form be altered to inquire whether Plaintiff "had a serious health condition certified by a health care provider that made her unable to perform the functions of her job on December 14, 2006?"  *Id.* at 3.

On January 7, 2009, the parties presented opening statements.  Plaintiff's opening statement referenced that Plaintiff was discharged in a manner inconsistent with Defendant's "progressive discipline" policy associated with attendance issues. Dkt. # 55 at 47.  Plaintiff also testified, without

objection from Defendant, that the "progressive discipline" policy was not utilized.  Dkt. # 57 at 52-55.

On January 8, 2009, the Court distributed a second draft of instructions based upon commentary received from the parties and the case as it was developing in the courtroom.  This draft continued to reference the termination of employment in the substantive instructions and the verdict form.

On January 12, 2009, Defendant commented on the second draft of instructions, as follows:

Defendant proposed [its alternate question on the verdict form] because it is concerned that the jury could be confused about the references and evidence relating to Plaintiff's termination in this case.  As the "Plaintiff's Claim: Interference with the Plaintiff's Rights under the FMLA" instruction correctly states, if the jury finds that Plaintiff was not entitled to FMLA leave on December 14, 2006, then its verdict must be for Defendant; but if the jury finds that Plaintiff was too incapacitated to work due to depression or PTSD and thus properly used FMLA leave, then its verdict must be for Plaintiff.  If the jury finds that Plaintiff was entitled to FMLA leave, then she should not have been discharged for the leave request (i.e., her FMLA rights have been interfered with), and she is entitled to termination-type damages.  The jury need not otherwise determine whether Defendant's termination of Plaintiff's employment was lawful, appropriate, or fair.

Defendant's concern in referencing the termination in Question 1 of the verdict form is that the jury could find that Plaintiff misused FMLA leave on December 14, 2006, but might believe that terminating her for that misuse was too harsh a penalty.  Under the law, as set forth in the "Interference" instruction, the jury is not entitled to engage in such an analysis or make such a determination.  For that reason, on January 6, Defendant proposed a "Statement of Claim and Defense" instruction that advised the jury as follows:  "In determining whether Defendant interfered with Plaintiff's FMLA rights, you need not decide whether termination of her employment was fair or appropriate."

If the jury answers Question 1 in the Court's verdict form "yes," the parties cannot know whether the jury improperly substituted its judgment for the Company's with regard to the discharge decision, and rendered what would then be a reversible verdict (i.e., find that the termination, but not the denial of leave, interfered with Plaintiff's FMLA rights).  To guard against that result, Defendant proposed the "Question 1" set forth above, which tracks the disputed elements of the "Interference" instruction, and omits reference to Plaintiff's termination, which is correctly not part of the "Interference" instruction.

-18-

Question 1 succinctly and accurately states the disputed issue that the jury is being asked to resolve, and is consistent with the Court's "Interference" instruction. Accordingly, Defendant requests that the Court replace Question 1 in its draft verdict form with question set forth above.

Dkt. # 47 at 4-5. After considering the parties' objections, the Court's third draft of instructions adopted Defendant's "Question 1" and excluded the previous reference to termination of employment in the substantive instructions and the verdict form.[3] Ultimately, this version was provided to the jury. Dkt. # 51; dkt. # 59 at 2. The jury instructions were finalized after all proofs were received and prior to closing arguments on January 14, 2006.

However, Plaintiff's counsel presented the following appeal during closing argument:

[W]e can't go back two years ago if you find for [Plaintiff] and say to [Defendant] don't fire [Plaintiff], she's been here almost 11 years. Why don't you just sit down with her, talk to her about it, come up with a game plan and give her the notice she's entitled to and move on. Give her a first written warning, put that in her file. But don't fire her, don't strip her of the only income she has. She's the sole support of her family, herself. She doesn't have anybody to help her with bills. Please don't fire her. You can't do that.

Dkt. # 59 at 24. Plaintiff's counsel reiterated the same thesis on two additional occasions during closing argument. *Id.* at 33, 40.

Rather than objecting to Plaintiff's argument, Defendant chose to respond in her argument as follows:

This dispute is also not about whether termination was the proper penalty if you find that [Plaintiff] misused FMLA leave. As you can again see from this instruction, there's nothing about termination, there's nothing about termination on the verdict form. So whether you believe [Defendant's] decision was fair or appropriate, the right one, that is not an issue. What you need to consider and what you only need to consider is whether [Plaintiff] properly used FMLA on December 14, 2006.

Dkt. # 59 at 48-49. Defendant did not renew its request for the instruction contained in its proposed

---

[3] "Termination" was referenced in the instruction intended to guide the jury with respect to determining damages. Dkt. # 51 at 8. That instruction provided, in part, as follows: "The plaintiff is seeking her lost wages, salary, employment benefits, or other compensation denied or lost to her because of the termination of her employment through today's date." *Id.*

instructions of January 6, 2009.

Defendant contends that the Court should have instructed the jury that the fairness or adequacy of Plaintiff's discharge was irrelevant. Omitting a requested jury instruction is "reversible error if: (1) the omitted instruction is a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Williams v. Eau Claire Pub. Sch.*, 397 F.3d 441, 445 (6th Cir. 2005) (citing *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 820 (6th Cir.1999)). The omitted instruction is to be viewed in context with instructions that were provided to jury. *See*, *e.g.*, *Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 434 (6th Cir. 2009).

It was undisputed that Defendant's termination of Plaintiff's employment constituted an act of interference if Plaintiff met her burden of proof of the other elements of her cause of action. Thus, Defendant's requested instruction was a correct statement of the law.

Next, while the instructions did not affirmatively address the termination, Defendant indicated to the Court that its "concern in referencing the termination in Question 1 of the verdict form [was] that the jury could find that Plaintiff misused FMLA leave on December 14, 2006, but might believe that terminating her for that misuse was too harsh a penalty." Dkt. # 47 at 4. In response, at Defendant's request, the interrogatory presented to the jury was tailored to exclude any mention of termination and focused the jury on Plaintiff's health on December 14, 2006. In Defendant's view, the interrogatory, which the Court adopted, "succinctly and accurately state[d] the disputed issue that the jury [was] being asked to resolve . . . ." *Id.* at 5. Indeed, at that juncture, the issue had not been directly raised with the jury and the Court's objective was to avoid introducing the issue.

It is true that Plaintiff's closing argument exceeded the relevant issue of fact. Defendant did

not, however, register an objection. *See* Fed. R. Evid. 103(a)(1). Rather, Defendant's counsel directly confronted Plaintiff's discussion of termination by guiding the jury to the interrogatory in the verdict form and explained to the jury that neither the instructions or the form of verdict permitted their consideration of the issue. At the conclusion of closing arguments, upon inquiry from the Court, Defendant did not request any additional instructions.

Consequently, in the Court's view, Defendant's theory of the case was not impaired. Throughout the balance of the litigation, Defendant maintained that Plaintiff fraudulently asserted FMLA rights, a circumstance that would not implicate Defendant's "progressive discipline" policy that addressed attendance issues. Moreover, Defendant represented that the change in the verdict interrogatory addressed its concern.

IV

Lastly, Defendant argues that the Court should vacate the award of front pay or order a new trial with respect to front pay because Plaintiff did not establish that she was entitled to front pay. If an employer is found to have interfered with an employee's FMLA rights, 29 U.S.C. § 2617(a)(1) authorizes "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation . . ." The Sixth Circuit has interpreted that language to authorize an award of front pay. *Arban v. West Pub. Corp.*, 345 F.3d 390, 406 (6th Cir. 2003). As an equitable remedy, the district court first determines whether front pay is appropriately awarded and, if so, a jury determines the amount. *Id.* (citing *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir.1993)).

The following factors are considered determining the propriety of an award of front pay: "(1) the employee's future in the position from which she was terminated; (2) her work and life expectancies; (3) her obligation to mitigate damages; (4) the availability of comparable employment

-21-

opportunities and the time reasonably required to find a substitute; and (5) the present value of future damages as determined through application of the appropriate discount rate." *Killian v. Yorozu Auto. Tenn., Inc*, 454 F.3d 549, 558 (6th Cir. 2006) (citing *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir. 1996)).  An award of front pay may not be "purely speculative." *Arban*, 345 F.3d at 407 (quoting *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002)).  However, "[n]o per se rule governs the appropriateness of front pay damages in a particular case . . . Ultimately, the question to be answered is whether front pay damages are needed in a particular case to make the plaintiff whole." *Id.* at 406 (quoting *Wilson v. Int'l Bro. of Teamsters*, 83 F.3d 747, 756-57 (6th Cir. 1996)).

In light of the proofs, an award of front pay was warranted.  Plaintiff offered testimony regarding mitigation attempts, the anticipated date of retirement, and her inability to find employment that was similarly compensated.  Defendant argues that Plaintiff's own testimony is insufficient to establish the propriety of front pay.  Notwithstanding the fact that Plaintiff did not offer testimony from an economist, an award of front pay was proper in this circumstance.  Plaintiff offered testimony concerning the factors addressed in *Arban*.  In addition, the Court specifically inquired of Defendant's counsel whether Defendant was willing to reinstate Plaintiff's employment and it was not.  Defendant elected to eliminate that equitable remedy, thus, leaving front pay as the reasonable alternative.  Consequently, the Court submitted the question of front pay to the jury for an advisory verdict.

Next, Defendant argues that the instruction regarding front pay was inadequate because it did not provide the factors enumerated above.  The jury was instructed as follows:

> The plaintiff is seeking her lost wages, salary, employment benefits, or other compensation denied or lost to her because of the termination of her employment through today's date.  She is also seeking her lost wages, salary, and employee benefits from today's date until the time you conclude she should reasonably be able

to secure employment.

Dkt. # 51 at 8-9.  In addition, the Court instructed the jury on Plaintiff's duty to mitigate damages, which included her responsibility to "make every reasonable effort to minimize or reduce her damages for loss of compensation by seeking employment." *Id.* at 9.  The jury was also instructed to reduce any future damages to present value. *Id.*

While Defendant now challenges the sufficiency of the instructions, Defendant's earlier objection only argued that the jury should not even consider front pay – it did not disagree with the substance of the instruction.  Defendant consistently argued that Plaintiff was not entitled to front pay and never suggested instructions with respect to the jury's calculation of front pay.  Consequently, Defendant waived its right to challenge the sufficiency of the instruction with respect to calculation of front pay.

Moreover, *Arban* indicates that those factors are relevant when determining "the propriety of front pay." 345 F.3d at 406.  As discussed above, in determining that an award of front pay was appropriate, the Court considered those factors.  The jury then determined an appropriate amount, which the Court agreed was supported by the record.

Lastly, Defendant argues that Plaintiff did not meet her burden that she was entitled to front pay, but the Court disagrees.  Plaintiff provided testimony concerning her compensation and benefits while employed by defendant, attempts to mitigate damages, her age and anticipated date of retirement, her employment history, and her desire to continue her employment for Defendant.  In light of the testimony and the fact that the jury's award of front pay was less than three times her 2006 salary, the award was not "purely speculative."  The Court will deny the motion to vacate the award of front pay.

IV

Accordingly, it is **ORDERED** that Defendant's motion for judgment as a matter of law and

for a new trial [Dkt. # 61] is **DENIED**.

It is further **ORDERED** that Defendant shall file a response brief to Plaintiff's motion for attorney fees [Dkt. # 53] on or before **July 15, 2009**.  Plaintiff shall file a reply brief on or before **July 22, 2009**.  The parties shall appear for a hearing on **August 5, 2009** at **2:00 p.m.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 2, 2009

<table>
<tr><td><b>PROOF OF SERVICE</b></td></tr>
<tr><td>The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 2, 2009.<br><br>s/Tracy A. Jacobs<br>TRACY A. JACOBS</td></tr>
</table>