UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARY-JO HYLDAHL,

        Plaintiff,

v.                                          Case Number 07-14948-BC
                                           Honorable Thomas L. Ludington

AT&T,

        Defendant.

_____/

## **OPINION AND ORDER GRANTING PLAINTIFF'S REQUEST FOR LIQUIDATED DAMAGES**

An eight-member jury determined that on December 14, 2006, Plaintiff Mary-Jo Hyldahl was entitled to leave under the Family and Medical Leave Act (FMLA) because she was suffering from a serious health condition. 29 U.S.C. § 2601. The jury further determined that Defendant AT&T interfered with her right to leave on that date and awarded Plaintiff $127,895.56 in back pay and $150,531.46 in front pay damages on January 14, 2009. [Dkt. # 50]. On August 17, 2009, the Court granted Plaintiff's motion for attorney fees, and awarded an additional $109,985.73 to cover attorney fees, interest, and costs. 29 U.S.C. § 2617(a)(3); [Dkt. # 85]. On May 24, 2010, the Court held an evidentiary hearing on the only remaining question: Is Plaintiff entitled to liquidated damages?

The statute requires an award of liquidated damages unless Defendant can demonstrate to the "satisfaction of the court" that the decision to deny leave on December 14, 2006 was made in "good faith" and "based on reasonable grounds." 29 U.S.C. § 2617(a)(1)(A)(iii). Although both Plaintiff and Defendant acted in good faith, Defendant's evidence does not convince the Court that its decision was based on reasonable grounds and that it should therefore exercise its discretion to

deny or reduce the award of liquidated damages. Accordingly, Plaintiff is entitled to liquidated damages equal to the back pay award plus prejudgment interest, or $134,936.27.

**I**

A detailed summary of the facts was provided in several earlier opinions. *See, e.g.*, *Hyldahl v. AT&T*, 642 F. Supp. 2d 707, 710–15 (E.D. Mich. 2009); [Dkt. # 70]. Plaintiff suffers from post-traumatic stress disorder ("PTSD") and depression. Plaintiff first received medical treatment in the late 1980s, and started treating with Anne Olsen, a mental health therapist with a masters degree in social work, and Dr. Kaushik Raval, a board certified psychiatrist and neurologist, in 1999. At the time, Olsen and Raval treated patients together through Delta Psychological and Neurobehavioral Services in Bay City, Michigan. Plaintiff met with Olsen as often as three times per week to develop coping mechanisms, and she received supplementary medical treatment and prescription antidepressants from Raval to manage her conditions. Plaintiff sought out Olsen and Raval because they accepted AT&T's medical insurance coverage, and they were "familiar with the stressors" at Plaintiff's workplace, treating "numerous" other AT&T employees. Pl.'s Resp. to Mot. for Summ. J. at 7; [Dkt. # 17]. Beginning in 2001, Plaintiff was authorized by Olsen and Raval to take up to 48-hours per month in intermittent FMLA leave in an effort to ward off her worst symptoms, including dissociative periods.

Plaintiff used more than 400 hours of FMLA leave over the next five years. In October 2006, Defendant began to investigate Plaintiff's use of FMLA leave after attendance manager Michael Bouvrette alerted the asset protection department that he suspected Plaintiff might be improperly using her medical leave to extend her weekends. *Id.* at 10. Bouvrette initially contacted FMLA case manager Mary Glass, who reviewed Plaintiff's FMLA certification forms and a calendar

of her absences, and forwarded that information to Dr. Judith Lichtenstein, a board certified psychiatrist who reviewed FMLA certifications for Defendant. Lichtenstein reviewed the certifications, the calendar of absences, and contacted Olsen in November. Based on her review and significantly relying on her understanding of Olsen's representations, Lichtenstein issued a report in November indicating that Plaintiff should be at home in bed when she is out of work on FMLA leave. *Id.* at 11. After reviewing Lichtenstein's report, Glass requested surveillance from the asset protection department. Plaintiff requested FMLA leave on November 30, December 5, and December 8, 2006, but the asset protection surveillance crew did not observe any activities that were inconsistent with medical leave. On the fourth date that Plaintiff was under surveillance, December 14, 2006, she used her medical leave time to go to the dentist, go out for lunch, get a haircut, attend a holiday party, and have dinner and drinks with a friend. Asset protection investigators followed Plaintiff on her errands and produced a video recording of some of her activities. The investigators forwarded their report and accompanying video to Glass, who reviewed them along with the Lichtenstein report reflecting her belief or Olsen's belief that Plaintiff should be home in bed when out of work on medical leave.

On December 18, 2006, Defendant informed Plaintiff that she had exceeded the 48-hours of intermittent leave authorized for December 2006, and that she needed to submit a new FMLA certification for the December 14 absence. Def.'s Mot. for J. at 13; [Dkt. # 61]. *See* 29 U.S.C. § 2613(a). On January 6, 2007, Olsen forwarded a revised FMLA certification form to Defendant, indicating that Plaintiff was unable to work on December 14, 2006 because of depression and PTSD. Olsen testified at trial that she provided the amended certification based on Plaintiff's representations over the phone concerning her ability to work on December 14. Olsen neither

examined nor spoke with Plaintiff on the phone on the date of the disputed absence. On January 2, 2007, before AT&T received the amended certification, Glass e-mailed investigator Paul Meisnitzer, asking him to schedule an interview with Plaintiff concerning her activities on December 14, and indicating that following the interview, she would "final deny [FMLA leave] the one day for sure and possibly the [second] day." [Dkt. 17-10]. Glass forwarded the asset protection report to Lichtenstein for her review, and a meeting with Hyldahl, Bouvrette, Meisnitzer, and a union representative was scheduled for January 4, 2007.

At the January 4, 2007 meeting, Plaintiff admitted each of her activities on December 14, and explained that she was suffering from PTSD and depression. On January 8, 2010, Glass reviewed Dr. Lichtenstein's December 29, 2006 report (Def.'s Tr. Ex. 127), and the report from the investigators based on their interview with Plaintiff (Def.'s Tr. Ex. 126). Def.'s Mot. for Summ. J. at 6; [Dkt. # 15]. Glass determined that Plaintiff's activities on that date were inconsistent with an inability to perform her job functions, and denied Plaintiff's request for FMLA leave. On January 19, 2007, Plaintiff's employment was terminated for "FMLA fraud." *Id.* at 9. On February 6, 2007, several weeks after the decision to terminate Plaintiff's employment was made, Lichtenstein issued a report (Def.'s Tr. Ex. 128) containing her analysis of Plaintiff's January 4, 2007 interview with company investigators and Olsen's January 6, 2007 letter and certification. Lichtenstein concluded, like Glass had earlier, that Plaintiff could have performed her job duties on December 14, 2006.

At the evidentiary hearing on May 24, 2010, the parties were asked to focus on the managerial decision making process surrounding Defendant's determination to disallow leave on December 14, 2006. Several additional points of information were learned, at least by the Court, during the hearing and will be highlighted. Testifying first, Donald Lee Stanley, Defendant AT&T's

senior manager for labor relations, explained the participation of the Communications Workers of America (CWA) in the process. The CWA, a labor union to which Plaintiff belonged, filed a grievance after Plaintiff was terminated. Stanley stated that his review of Plaintiff's file indicated that the grievance related to Plaintiff's termination for "FMLA fraud." The CWA pursued the grievance through the first three steps of the process, but did not pursue the grievance to arbitration. Stanley explained that the union will always file a grievance after a member is terminated, but it will not always proceed to arbitrate the grievance. In a September 18, 2007 letter to Hyldahl, the CWA explained that arbitration was not pursued because "[t]he observations of the grievant on the day in question coupled with information contained in the grievant's voluntary statement to the investigator, the included medical documentation notwithstanding, would seem sufficient to convince most arbitrators that the Company had just cause for the discharge." [Dkt. # 117-1].

Testifying next, Mary Glass, an "FMLA escalation support manager" for Defendant AT&T, described her role in denying Plaintiff's request for FMLA leave on December 14, 2006. Glass testified that she made the final decision to deny Plaintiff's FMLA leave after reviewing several categories of evidence, including the results of an internal investigation, surveillance logs and video footage provided by the investigators, medical certification forms, a calendar of absences, and the evaluation of Plaintiff's certification provided by Dr. Judith Lichtenstein. Significantly, Glass noted that she "gave a lot of weight" to Lichtenstein's report, which indicated that Plaintiff's "observed physical activities on . . . December 14, 2006 [were] inconsistent with the expected incapacity from working due to her serious health conditions of 'Post-Traumatic Stress Disorder and Severe Recurring Depression, Anxiety and Chronic Pain.' " *See* Def.'s Tr. Ex. # 127.

Glass testified that it was important to her that neither Plaintiff nor her treaters specifically

explained how Plaintiff was able to perform the activities she did on that day but unable to perform her job functions. Also of interest to Glass was the January 6, 2007 certification from social worker Anne Olsen, and an accompanying letter intended to provide further information. Pl.'s Tr. Ex. # 14, 17. Although both the letter and the certification form stated that Plaintiff was suffering from depression and PTSD on December 14, neither, in Glass's opinion, provides a description of the symptoms Plaintiff contends she was experiencing or a psychiatric, a psychological, or a medical explanation of what prevented her from working but permitted her to schedule a dental appointment, get her hair cut, attend a holiday party, and go out for lunch and dinner. In Glass's view, Plaintiff's conduct was plainly inconsistent with the certification and the letter, making Lichtenstein's report more persuasive. Glass testified that Defendant paid approximately $1,500 for Lichtenstein to review the case.

Glass acknowledged that employees with chronic medical issues like Plaintiff's PTSD and depression were not expected to see a medical professional each day that they were absent from work on FMLA leave. She further acknowledged that Plaintiff was always truthful in her representations to investigators, and the termination for "FMLA fraud" referred to the company's view that Plaintiff's behavior on December 14 proved she was able to work that day and not misstatements by Plaintiff to the company. Glass testified that she was aware that FMLA regulations permitted her to require Plaintiff to undergo additional medical evaluations, including a third evaluation in light of the conflict between Lichtenstein and Olsen. 29 C.F.R. § 825.307. Glass indicated that in her opinion, this was not a close case; she believed that Plaintiff and Olsen were wrong and that it was clear that Plaintiff could have been at work on December 14, 2006. She believed an additional medical opinion was unnecessary.

Anne Olsen, a social worker who was treating Plaintiff at the time of the disputed leave, also testified at the hearing. Olsen said that Plaintiff's actions on December 14, 2006 were consistent with the self-reported symptoms they had been addressing for several years, and largely positive examples of Plaintiff utilizing "coping mechanisms" they had developed together during treatment. Other than the behavior that Olsen characterized as "wandering" through drive-through restaurants, which indicates that Plaintiff was having difficulty concentrating on the day in question, Olsen testified that Plaintiff's behavior was consistent with the her use of PTSD "coping" options.

Olsen testified that the dental pain Plaintiff was experiencing, the proximity of the events to the holiday season, and the wandering behavior could have contributed to her inability to work on the disputed date. Olsen struggled, however, to provide clinically identifiable symptomology she had advised her patient to use in deciding when she was entitled to FMLA leave, let alone which of those symptoms were present on December 14, 2006 or how they may have affected her ability to perform her work tasks. Olsen described how Plaintiff felt based on Plaintiff's report, using terms like "agitated," "distressed," "confused," "feeling emotionally intense," "rambling or broken thoughts," and "feeling angry." The most objective indicators that Plaintiff could not work on December 14 identified by Olsen were that Plaintiff "might have a short fuse," making it difficult for her to work with co-workers and customers, and that Plaintiff would sometimes speak in broken phrases. Olsen testified that she had advised Plaintiff that she should not work on days she felt unable to meet her own expectations about the quality of her work or could not control potential outbursts.

Plaintiff was the final witness to offer testimony at the hearing, asserting that she was always honest with her employer about her medical issues. She explained that she "had a really bad day"

on December 14, 2006, and utilized FMLA leave so that she had time to employ the "coping" options she and Olsen had spent years developing. Plaintiff testified that she was not aware of any travel restrictions associated with her condition, and that her activities were based on her emotional condition. She was upset, anxious, and lacked concentration—leaving her unable to work—yet she did not want to be alone. Accordingly, she sought opportunities to interact with people she felt comfortable with in low-stress environments as she understood she had been advised to do by Olsen and Dr. Raval. Plaintiff further testified that she did not explain her activities as a "coping" strategy to company investigators because she believed that identifying her PTSD condition responded to their questions. She further testified that investigators never asked for additional information. If Defendant wanted more information, Plaintiff stated that she would have explained her actions personally or signed a release permitting AT&T to talk with Olsen at its request.

Lichtenstein, AT&T's independent medical evaluator, did not testify at the hearing, but her deposition testimony from May 7, 2010 was accepted into evidence. Lichtenstein testified that in her view, Plaintiff could have worked on December 14, 2006, and she questioned the validity and credibility of Olsen's certification and Plaintiff's testimony based on their lack of specificity. Lichtenstein Dep. at 32, 66. Lichtenstein noted that Plaintiff described her emotional state as "distracted" and "anxious" but Plaintiff could not, in Lichtenstein's opinion, identify the type of "acute emotional pain" that would prevent her from performing her job duties. *Id.* Lichtenstein noted that the best objective evidence of Plaintiff's ability to perform her job functions on the disputed date was the fact that she drove 150 miles during more than ten-hours of activities outside her home. *Id.* at 37. In Lichtenstein's view, the demonstrated ability to drive and function outside the home called into question Plaintiff's asserted inability to concentrate and extreme feelings of

anxiousness. Plaintiff's activities were, in Lichtenstein's opinion, inconsistent with the severe symptoms that would justify FMLA leave. Lichtenstein also testified that she understood from Olsen that Plaintiff should not have been driving when she was out of work due to depression and PTSD. Olsen disputes that assertion. Plaintiff testified that Olsen never so advised her.

**II**

The FMLA permits eligible employees to take up to twelve weeks of leave per year due to a "serious health condition." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). If an employer interferes with an eligible employee's right to leave, the employer is liable for compensatory damages, including lost earnings and interest. 29 U.S.C. §§ 2615, 2617. The employee is also entitled to liquidated damages in an amount equal to the compensatory damages unless the employer can show to the satisfaction of the court "*both* good faith *and* reasonable grounds" for the violation. *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 251 (6th Cir. 2004) (quoting *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 827 (6th Cir. 2002)); *see also* 29 U.S.C. § 2617(a)(1)(A)(iii).

Accordingly, to avoid liquidated damages, Defendant must "prove[] to the satisfaction of the court that" its decision to disallow FMLA leave for December 14, 2006 was made "in good faith" and that it had "reasonable grounds for believing" that the decision did not violate the FMLA. 29 U.S.C. § 2617(a)(1)(A)(iii). *Compare Hoge*, 384 F.3d at 251 (upholding district court's determination that liquidated damages were not justified because employer's decision was both in good faith and reasonable) *with Chandler*, 283 F.3d at 827 (upholding district court's award of

liquidated damages because even if employer's actions were in good faith, they were unreasonable).

If Defendant is unable to meet its burden of proof on either or both questions, Plaintiff is entitled to receive liquidated damages in the amount of $134,936.27, which is the jury's back pay award plus pre-judgment interest. *See Taylor v. Invacare Corp.*, 64 F. App'x 516, 518 (6th Cir. 2003) ("[L]iquidated damages are limited to back pay and pre-judgment interest . . . ."); *see also* 29 U.S.C. § 2617 (a)(1)(A)(iii). If, however, Defendant meets its burden of proof on both questions, the amount of liquidated damages "may, in the discretion of the court," be reduced. *Id.*

Here, as earlier noted, the Court is satisfied that all parties were acting in good faith. Plaintiff was honest with the company in describing her activities on December 14, 2006. She also followed her treaters' instructions faithfully. Defendant, on the other hand, genuinely believed that Plaintiff was abusing her right to FMLA leave based on the medical evidence from Lichtenstein and the surveillance evidence provided by its investigators. Mary Glass, after reviewing the investigative file and expending a substantial amount of time and money considering the issues presented, determined that Plaintiff's activities could not be reconciled with an inability to perform the functions of her job. She weighed the competing medical assessments from Olsen and Lichtenstein and determined that Lichtenstein's was entitled to "more weight." Indeed, even the union representative charged with serving as an advocate on Plaintiff's behalf agreed that the "medical documentation notwithstanding," Plaintiff's conduct was inconsistent with an inability to perform her job duties. [Dkt. # 117-1]. In short, both parties acted in good faith.

Defendant has not, however, met its burden with respect to the second statutory requirement. To evaluate the question of whether Defendant had "reasonable grounds for believing" that its decision to disallow leave on December 14, 2006 complied with the FMLA, 29 U.S.C. §

2617(a)(1)(A)(iii), it is important to first revisit the statutory scheme Congress developed for evaluating leave requests. The statute permits eligible employees to take up to twelve workweeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employer may, however, "require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee . . . ." 29 U.S.C. § 2613(a). The certification must provide the date on which the serious health condition commenced; the probable duration of the condition; "the appropriate medical facts within the knowledge of the health care provider regarding the condition"; and "a statement that the employee is unable to perform the functions of the position of the employee[.]" 29 U.S.C. § 2613(b)(1–4). If an employer doubts the authenticity of the certification provided by the employee, the employer may, at its expense, require a second opinion. 29 U.S.C. § 2613(c–d); 29 C.F.R. § 825.307.

Importantly, the statutory scheme necessarily relies, in the first instance, on the "certification" provided by the employee's health care provider. The health care provider must be willing to furnish the certification to ensure the employee's eligibility for leave. The certification must provide not only information about the employee's health, but also occupational information about whether the employee is "unable to perform the functions of the position of the employee." 29 U.S.C. § 2613(b)(4)(B). As part of that process, an employer "has the option . . . to provide a statement of the essential functions of the employee's position for the health care provider to review." 29 C.F.R. § 825.123. In the immediate case, there was no indication such a list was provided by the employer.

Equally important, the certification scheme outlined in the statute is not mandatory. An

employer "may" require a certification but is not required to do so in order to challenge an employee's eligibility for leave. 29 U.S.C. § 2613(a); *see also Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 860 (8th Cir. 2000) (noting that the right to require a certification, like the right to challenge the certification through acquisition of a second opinion, are permissive rather than mandatory); *but see Miller v. AT&T*, 60 F. Supp. 2d 574, 580 (S.D. W. Va. 1999) ("An employer who wishes to contest the validity of a medical certification must use the second-opinion procedures of § 2613(c)–(d)."); *Sims v. Alameda-Contra Costa Transit Dist.*, 2 F. Supp. 2d 1253, 1260 (N.D. Cal. 1998) (noting it is "not clear" from the statute whether an employer wishing to challenge an employee's certification must obtain a second or third opinion).

Turning to the facts presented in this case, it is undisputed that PTSD and depression are serious health conditions, which merit intermittent leave under the FMLA. It is also undisputed that Plaintiff exercised her right to that leave on December 14, 2006, and provided, at Defendant's request, the required certification from her health care provider. Defendant, concerned about the accuracy of that certification, requested review of the certification by its own expert, Dr. Lichtenstein. Up to that point, Defendant had properly challenged Plaintiff's exercise of FMLA rights without unlawfully interfering or restraining those rights.

Then, Glass compared Lichtenstein's medical evaluation to Olsen's evaluation, as supported by the surveillance logs, video, and statements of investigators, and determined that Olsen's certification lacked credibility and that there was no justification for Plaintiff to be absent from work. At that point, the question becomes whether Glass had "reasonable grounds for believing" the FMLA provided her with authority to give prevailing weight to a non-treating health care provider, who had never examined the employee, and reject the facially valid certification of a

treating provider.  While there may be situations where it is reasonable to believe such a decision complies with the statute, it is unreasonable when considering how a psychological condition affects an employee's ability to do her job.  In those situations, the statutory scheme for second and third opinions must be followed.  29 U.S.C. § 2613(c–d); *Miller*, 60 F. Supp. 2d at 580.

Plaintiff's medical condition is not one that is obvious to a casual observer, but depression and PTSD were serious health conditions that were identified and treated by Olsen.  Olsen's often vacuous testimony made it difficult to pin down exactly what Plaintiff's symptoms were and the precise advise she had furnished her patient, but it does not change the fact that Olsen confirmed Plaintiff was suffering from those symptoms on December 14, 2006 and unable to work.  It also does not change the fact that Plaintiff's activities were, in Olsen's opinion, consistent with the coping mechanisms they had developed to treat those symptoms.  Before disregarding the FMLA certification and disallowing leave for that day, Defendant was required to obtain a second, and potentially third, opinion from an independent medical professional concerning whether Plaintiff was suffering from PTSD and depression on December 14, and if she was, whether her activities were consistent with the plan she and Olsen had developed to treat that condition.  29 C.F.R. § 825.307.  Without those opinions, Defendant was not permitted to disregard the certification and letter from Olsen.

If Plaintiff's medical condition were something physical and observable to a lay person, a broken leg for example, it may be possible to reject a certification provided by a health care provider without obtaining a second or third opinion.  A lay observer would be qualified to determine whether a person on FMLA leave due to a broken leg was complying with the restrictions on mobility or physical exertion that kept that person out of work.  Psychological problems, however, create

additional challenges. Although a lay person can easily determine if an employee who is out of work because she cannot walk is improperly walking while on leave, it is more difficult for a lay person to determine if an employee is out of work because of anxiousness, and unable to concentrate to the point that she is unable to perform the essential functions of her work.

It is also significant that there was a high degree of disparity between the competing medical opinions in this case. Olsen and Lichtenstein offered very different opinions about Plaintiff's ability to work, and Glass—a human resources professional, not a medical professional like Lichtenstein, Olsen, and Raval—was left with the task of reconciling those opinions or choosing which one prevailed over the other. Importantly, Glass completed the task without any additional medical advice.

### III

Acting on behalf of Defendant AT&T, Mary Glass made a good faith but unreasonable decision to deny Plaintiff FMLA leave for December 14, 2006. As a result, Plaintiff is entitled to liquidated damages in an amount equal to the back pay awarded by the jury plus prejudgment interest. 29 U.S.C. § 2617(a)(1)(A)(iii).

Accordingly, it is **ORDERED** that Plaintiff's request for liquidated damages [Dkt. # 111] is **GRANTED**. Plaintiff is entitled to a liquidated damages award of $134,936.27.

It is further **ORDERED** that entry of this opinion and order resolves all remaining matters before this Court, closes the case, and commences the time in which an appeal may be filed. Fed. R. App. P. 4.

                                                       s/Thomas L. Ludington  
                                                       THOMAS L. LUDINGTON  
                                                       United States District Judge

Dated: June 25, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 25, 2010.

        s/Tracy A. Jacobs
        TRACY A. JACOBS